Filed 3/20/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| In re | B327617 |
|-------|---------|
| TRAVON E. SUMMERS | (Los Angeles County Super. Ct. No. YA089368) |
| on Habeas Corpus. | |

ORIGINAL PROCEEDINGS on petition for writ of habeas corpus.  Scott T. Millington, Judge.  Petition denied and order to show cause discharged.

Sally Patrone, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller, John Yang, and David F. Glassman, Deputy Attorneys General, for Respondent.

_____

**INTRODUCTION**

Petitioner Travon E. Summers filed this petition for writ of habeas corpus seeking to overturn his 2014 convictions for four counts of attempted deliberate and premeditated murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a))[1] because they did not comply with the limitations on a concurrent intent or "kill zone" theory of liability imposed by the Supreme Court in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*). We issued an order to show cause as to three of the counts. We reject Summers's claims of insufficient evidence to support the kill zone instruction, insufficient evidence to sustain the convictions, and instructional error. We deny the petition and discharge the order to show cause.

**FACTS AND PROCEDURAL BACKGROUND**

**I. The Facts[2]**

Summers was a member of the Legend Crips gang. William Harrison[3] was a member of the Mad Ass gang. The two gangs were rivals. In February of 2013, William had a verbal confrontation with other Legend Crips gang members.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] We take the underlying facts from the nonpublished opinion, *People v. Summers* (Sep. 11, 2015, B259913). At the request of Summers and the Attorney General, we take judicial notice of the court's record. (Evid. Code, §§ 452, subd. (d)(1), 459.)

[3] Because William Harrison and his younger brother James Harrison have the same last name, we refer to them by their first names.

2

On June 26, 2013, at about 3:00 p.m., William's mother Vandalena Mahoney was at her house on South Osage Avenue in Inglewood. From her bedroom window, Mahoney saw Summers standing across the street. Summers was staring at Mahoney's house. She called William and stated that a "gang-banger" was watching their house. According to Mahoney, Summers and others had watched her house for three months.

While waiting for William to come home, Mahoney took her grandchildren outside. Sir was Mahoney's five-month-old grandson. Armi was her five-year-old granddaughter. Nayvi was her eight-year-old granddaughter. James, Mahoney's other son and William's younger brother, went outside with them.

Mahoney's house was on the west side of South Osage. The front of the house faced east in the shape of the letter U. Facing the house looking west, the main front door is on the left or to the south. The attached garage is on the right or to the north. A driveway leads from South Osage Avenue to the garage. A concrete patio is in the center or the valley of the U. The roof extended over the patio. The front yard consisted of a lawn bound by a brick wall on the east, separating it from the sidewalk, by the driveway on the north, and by a wire fence on the south. A tree was on the neighbor's front yard on the other side of the wire fence.

Mahoney was sitting outside on a chair at a patio table in the northwest corner of the U. Sir was in a bouncer or car seat on top of the table. James was initially sitting on a porch on the patio, in front of a door that led to a bedroom. Mahoney was two feet from that door. Armi was behind her and Nayvi was at the main front door.

When William arrived, he parked his car in the driveway. He got out of the car and walked toward the house. Mahoney saw Summers run from across the street to a tree about 49 feet from her. She saw Summers pointing his handgun towards "where [they] were all sitting."

James said, "Man, that's a dude walking down the street." James could see Summers aiming his firearm in their direction. He told William, "Look out, Bro" and "Get down. He got a gun."

From the tree, Summers fired a .45 caliber handgun five or six times. James was diagonally behind William or to his side when he pushed him to avoid getting hit. William fell to the ground and crawled inside the house. James ran inside the house.

When Summers was firing the shots, Mahoney shielded Sir and "threw" him into the house. She returned outside alone. Mahoney saw Summers fire one last shot and she said, "You fucker," as he ran.

One bullet struck a vertical rain gutter in the northwest corner of the U, on the south-facing wall of the garage. A bullet fragment was found in front of the patio table.

## II.    Procedural Background

On August 18, 2014, the jury found Summers guilty of five counts of attempted deliberate and premeditated murder (§§ 664, 187, subd. (a)) of Mahoney (count 1), James (count 2), William (count 3), Sir (count 4), and Jane Doe[4] (count 5), as well as dissuading a witness for gain (§ 136.1, subd. (a)(2); count 7), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 8).

---

[4]    On August 5, 2014, prior to opening statements, the trial court granted the District Attorney's motion to amend the named victim in count 5 of the information from Armi R. to Jane Doe.

4

The jury also found that the crimes in counts 1 through 7 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b).) The jury found enhancements for personally using a firearm (§ 12022.53, subd. (b)) and personally discharging a firearm (§ 12022.53, subd. (c)) true for counts 1 through 5.

For each attempted deliberate and premeditated murder with the gang penalty provision in counts 1 through 5, the court sentenced Summers to 15 years to life, plus 20 years for the personal discharge of a firearm enhancement. The court imposed consecutive sentences for counts 1, 2, and 3, and concurrent sentences for counts 4 and 5. The court imposed concurrent terms of 2 years each on counts 7 and 8.

Summers appealed the judgment. Among other claims, Summers challenged the sufficiency of evidence for four of the attempted murder counts (all but count 2 against William) and the validity of the kill zone theory in CALCRIM No. 600. On September 11, 2015, this division rejected the contentions and affirmed the judgment. (*People v. Summers*, *supra,* B259913.)

On April 12, 2022, Summers filed a petition for writ of habeas corpus in the superior court. He argued that the evidence was insufficient to proceed on a kill zone theory. On March 17, 2023, the superior court denied the petition.

On April 6, 2023, Summers filed a petition for writ of habeas corpus in this court. On July 19, 2024, this court issued an order to show cause for the Secretary of the Department of Corrections and Rehabilitation to show why Summers should not be granted the relief he has requested as to counts 1, 4, and 5. Summers's counsel filed a supplemental petition and traverse and the Attorney General filed a return.

# DISCUSSION

In his petition, Summers argues that substantial evidence did not support instructing the jury on the kill zone theory for the attempted murders of Mahoney, Sir, and Armi in counts 1, 4, and 5 respectively.  He also argues that insufficient evidence supported the convictions for those counts.  Finally, he contends that the kill zone jury instruction in CALCRIM No. 600 omitted the required elements of a primary target, the defendant designing or creating a kill zone with the intent to kill everyone in it, and the secondary targets being in the kill zone.

## I.     Attempted Murder and Concurrent Intent

Attempted murder requires "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  When a defendant commits a single act against two or more persons, determining the number of attempted murders requires an independent examination of his or her intent to kill for each victim.  (*People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).)  Intent to kill cannot transfer from one attempted murder victim to another.  (*Ibid*.)

Although intent to kill cannot transfer among victims, the Supreme Court in *Bland* provided for concurrent intent to kill to establish attempted murder against each person who a defendant tries to kill by a single act.  (*Bland*, *supra*, 28 Cal.4th at p. 329.)  Concurrent intent is established when the defendant, while targeting a specific person, tries to kill everyone in the area in which that targeted person was located to ensure his or her death.  In doing so, the defendant specifically intends to kill everyone in that area.  (*Ibid*.)  The Court labeled this area around

6

the primary target as the "kill zone."[5] (*Ibid*.) This concurrent intent theory, nicknamed the kill zone theory, allows for a conviction of attempted murder against any victim who was in the specified area but was not the defendant's primary target. (*Id*. at pp. 329–330; *People v. Smith* (2005) 37 Cal.4th 733, 745–746 (*Smith*).) As a result, it provides a shortcut to determine that the defendant had the intent to kill those nonprimary target victims.

After Summers's trial and appeal, the Supreme Court in *Canizales*, *supra*, 7 Cal.5th at page 607, limited the application of the kill zone theory. According to *Canizales*, the kill zone theory may only be applied when: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of the force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target[;] and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Ibid*.)

The kill zone theory relies on circumstantial evidence to establish the defendant's intent to kill the primary target, as well as everyone else in the kill zone, and the scope of that zone. (*Canizales*, *supra*, 7 Cal.5th at p. 606.) *Canizales* listed potential circumstances of the attack that would establish the requisite intent and the scope of the kill zone. These include "the type of weapon used, the number of shots fired (whe[n] a firearm is

---

[5] The Supreme Court adopted the term "kill zone" from the Maryland case of *Ford v. State* (1992) 330 Md. 682, 717. (*Bland*, *supra*, 28 Cal.4th at p. 329.)

used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Id.* at p. 607.) Additional relevant circumstances include whether the defendant fired into an open area or one with a limited means of escape, and whether he or she struck the targets. (*Id.* at pp. 610–611.)

*Canizales* cautioned that the kill zone theory will apply in "relatively few cases." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) To instruct on it, the trial court must conclude there is sufficient evidence to support a determination that "the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Ibid.*) "[M]erely endanger[ing] everyone in the area" will not support the kill zone instruction. (*Ibid.*, italics omitted.)

## II. Standard of Review

To determine whether the trial court validly instructed on the kill zone theory, we review the record for substantial evidence to support a reasonable inference that the defendant intended to kill everyone within the kill zone as a means of killing his or her primary target. (*People v. Mumin* (2023) 15 Cal.5th 176, 203 (*Mumin*); *Canizales*, *supra*, 7 Cal.5th at p. 609.) "Thus, an appellate court retrospectively inquires whether a rational trier of fact *could have* found the defendant guilty beyond a reasonable doubt, based on all the evidence when viewed in the light most favorable to the prosecution." (*Mumin*, at p. 199.)

## III. Substantial Evidence to Support the Kill Zone Instruction

### A. *Intent to create a kill zone*

Summers waited to attack William outside of Mahoney's house when he arrived. The configuration of the front exterior of

Mahoney's house was conducive to Summers creating the kill zone. The photos admitted at trial depicted the location into which Summers fired gunshots. The location consisted of a patio bounded by three exterior walls in the shape of the letter U. The exterior walls enclosed the three sides of the U. The north side was the south wall of the attached garage. When facing the house, it would be on the right. A patio table and three chairs were in front of the west side or the valley of the U. When facing the house, this area would be in the center. The eave of the roof extended over this patio area where the table and chairs were located. Another portion of the house formed the south side of the U. This wall was parallel to the garage. The lawn of the front yard extended from the patio area to the sidewalk. The lawn was bound by a brick wall against the sidewalk, a lower brick wall along the driveway to the north, and a wire fence that divided Mahoney's house and the neighboring property to the south.

Summers executed his attack in a strategic manner. He waited until William parked his car in the driveway and approached the house, before running from the street to a tree in the front yard of the southside neighboring house. Summers was on the neighbor's side of the wire fence. He was 49 feet southeast of Mahoney, Sir, and Armi who were at the patio table in the northwest corner of the U. From the tree, Summers had a direct line of fire into the northwest corner when he fired five to six shots with a .45 caliber handgun.

Summers's gunfire from the tree allowed him to pin William and the others into the northwest corner of the U. Their only effective escape from the gunfire was a door to a bedroom that was accessible behind the patio table and chairs. This door

9

was the closest entrance to the house for William, James, Mahoney, Sir, and Armi. The other alternatives—the main front door farther to the left or the street—would have exposed them to gunfire. Permitting only this "limited means of escape," Summers's position at the tree and the number and caliber of shots he fired into the northwest corner could have effectively killed all the victims in the kill zone he created. (*Canizales*, *supra*, 7 Cal.5th at p. 611.) We can reasonably infer from these circumstances that Summers took a purposeful selection of the tree as his position to fire at and kill William and everyone else in the northwest corner.

Summers argues that if he targeted William's family members, the house would have been sprayed with bullets. *Canizales* explained that the number of shots is relevant to the determination of intent to create a kill zone, but it is not dispositive. (*Canizales*, *supra*, 7 Cal.5th at p. 610.) We further agree that none of the victims was struck and the damage to the house was minimal. But a determination of the intent to create a kill zone "does not turn on the effectiveness or ineffectiveness of the [attempted killer's] chosen method of attack." (*Id.* at p. 611.)

The circumstances here were drastically unlike those in *Canizales*, which the Court determined were insufficient to support the kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at pp. 610–611.) The shooter in *Canizales* fired shots at his primary target from 100 to 160 feet away. The shooting occurred at a block party on a wide city street, open and unconfined by any structure. (*Ibid.*) Bullets were described as " 'going everywhere,' " rather than targeting specific victims. (*Ibid.*)

At 49 feet away from Mahoney, Sir, and Armi at the patio table, Summers fired from a position significantly closer to the

10

victims than that in *Canizales*. The U-shaped configuration of the house was the type of "structure from which victims would have limited means of escape," unlike the wide city street in *Canizales*. (*Canizales*, *supra*, 7 Cal.5th at p. 611.)

*Mumin* does not help Summers either. Unlike Summers, Mumin fired only three shots from the confines of a room "out into an open area." (*Mumin*, *supra*, 15 Cal.5th at p. 205.) The victims in *Mumin* could have escaped in a variety of directions or taken protective cover. The secondary victim was also at least 25 feet away from the primary victim requiring greater force by the shooter to demonstrate an intent to create a kill zone. (*Ibid*.) The distance between William and the others was considerably less, as we will discuss. Summers's five or six shots constituted sufficient force to kill the five victims who were grouped together in the corner of the U.

### B. *The scope of the zone*

The second prong of the test formulated by *Canizales* evaluates the scope of the kill zone.[6] Specifically, we must consider the circumstances of the attack to determine the scope of that zone and whether the nonprimary target victims were located within it. (*Canizales*, *supra*, 7 Cal.5th at p. 612.) An area where the victims were subjected to the mere risk of lethal harm is insufficient. It must be an area in which the shooter intended to kill everyone. (*Ibid*.) Again, the circumstances of the attack inform our determination.

---

[6] Because the Supreme Court concluded that the evidence was insufficient to support a finding that the defendants intended to create a kill zone, it did not determine the scope of the zone. (*Canizales*, *supra*, 7 Cal.5th at p. 611.)

11

### 1. James

When Summers began shooting, James was the closest to William. When William arrived home and got out of the car, James got up from sitting on the porch to the bedroom door in the patio. He stated, "Man, that's a dude walking down the street." James saw Summers jog up to the tree and pull out a gun. James could see Summers aiming his firearm in their direction. James stated, "Look out, Bro" and "Get down. He got a gun." When Summers fired, James pushed William to avoid getting hit. James was diagonally behind William or to his side. He was closer to the house than William was.

Summers fired five or six shots. A bullet struck the south wall of the attached garage, next to a vertical rain gutter on the north side of the U, near the bedroom door. The bullet could have hit William or James. According to William, the bullet struck two to four feet from where he was standing. According to Mahoney, based on where William was positioned, his head would have been struck by the shot, if he did not go to the ground. James's proximity to William placed him within the trajectory of the bullet.[7]

### 2. Mahoney, Sir, and Armi

Mahoney, Sir, and Armi were within the kill zone. They were to James's right. Mahoney was sitting at the patio table. Armi was standing next to Mahoney, on her right or behind her.[8]

---

[7]    Count 2, related to the attempted murder of James, is not a subject of this petition.

[8]    The parties did not dispute that one of Mahoney's granddaughters was next to her at the table. The trial court permitted the prosecutor to argue that the victim in count 5,

Armi was next to a pole that held up the eave of the roof hanging over the table. Sir was on the table in a car seat or bouncer. When the shooting began, Mahoney moved around the table and a chair on the south side of the table to shield Sir.

The witnesses' testimony provided an estimated range of two feet to seven feet from William to Mahoney, Sir, and Armi during the shooting.[9] These estimated distances are less

named as Jane Doe, was "the other child next to [Mahoney]." The prosecutor told the jury that Jane Doe in count 5 was the "child standing by the table where [Mahoney] was sitting . . . [Mahoney] says it was Armi and James says it was Nayvi." The prosecutor explained, "[a]s long as you decide there was a human being standing next to that table, defendant is guilty of attempted murder of that person, could be Nayvi, could be Armi. That's up to you. As long as there's a human there, that's count 5."

Prior to trial, the court dismissed count 6 with "Navy [sic] F." as the named victim, pursuant to section 995. According to the trial court, the preliminary hearing evidence placed Nayvi outside of the kill zone. Summers and the Attorney General agree that Nayvi was the victim of the attempted murder in count 6, which was dismissed pursuant to section 995. Armi would be the victim in count 5, based on this agreement and the dismissal of the count naming Nayvi as the victim. Consequently, Armi would be the granddaughter next to Mahoney at the table.

Because we are required to view the evidence in the light most favorable to the judgment, we adopt the testimony of Mahoney and James who placed Armi at the table, over William's testimony that she was in the yard with Nayvi.

[9] Mahoney described herself as two feet from William. But she also conceded that she was not adept at determining distances in feet.

13

probative of their positions than the visual depictions of those positions in the photos admitted at trial. But even at seven feet, the distance between the primary and secondary targets was significantly less than the distance of 25 feet which did not support a kill zone theory in *Mumin*. (*Mumin, supra*, 15 Cal.5th at p. 205.) We also agree with the Attorney General that the distance between the subjects "shrinks significantly from the perspective of [Summers] . . . who stood by a tree south-east of the seating area from 49 feet away."

The photos revealed the table and chairs in the northwest corner of the U. The table and chairs were next to the rain gutter where the bullet hole was discovered. On the photos, the witnesses indicated the positions of Mahoney, Sir, and Armi at the table. From Summers's perspective, William, James, Sir, Mahoney, and Armi were lined up in a row to shoot. William was in front of James. Sir, Armi, and Mahoney were at the patio table behind James or to his right side.

Mahoney's observation that Summers pointed his gun toward where they were all sitting was consistent with James's observation that he pointed the gun at William and him. These observations support Summers firing at William and everyone behind him. As positioned, they were in Summers's direct line of fire.

There is little question that Mahoney, Sir, and Armi were visible to Summers. Before Summers began shooting, he had

---

James gave different measurements when he testified at trial and at the preliminary hearing. At trial, James said he and William were six to seven feet from Mahoney and Sir at the table. At the preliminary hearing, he testified they were 12 to 14 feet away from her.

been watching Mahoney's house, presumably waiting for William to arrive. We can reasonably infer that Summers would have seen Mahoney when she went outside to the patio table with Sir and Armi and when she stood up to shield Sir from the gunfire. Immediately prior to firing, Summers would have seen them as William walked toward the patio from the driveway. Based on their positions which were reasonably visible to Summers and their proximity to William and the location struck by the gunfire, there was substantial evidence that Mahoney, Sir, and Armi were in the scope of the kill zone.

Viewing the evidence in the light most favorable to the judgment and presuming the existence of every fact the jury could reasonably deduce from the evidence in support of the judgment (*Smith*, *supra*, 37 Cal.4th at p. 739), we conclude the trial court properly instructed on the kill zone theory based on the substantial evidence that the only reasonable inference from the circumstances of Summers's attack was that he intended to create a kill zone as a means of killing William and that Mahoney, Armi, and Sir were in the scope of that kill zone. (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

## IV.    Sufficient Evidence to Support Convictions for Counts 1, 4, and 5

We reject Summers's contention that insufficient evidence supported the convictions for counts 1, 4, and 5. Our conclusion that substantial evidence supported the kill zone instruction for Mahoney, Sir, and Armi also leads us to conclude that substantial evidence supported the convictions of attempted murder under the kill zone theory. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528.)

Substantial evidence also supported the conviction for the attempted murder of Mahoney based on a direct intent to kill theory. Summers demonstrated his intent to kill her when she returned to the patio area after carrying Sir to safety inside the house through the bedroom door located at the west wall. Mahoney came back outside, stood in the walkway, and saw Summers take his final shot. She stated, "You fucker," as Summers began running away. According to Mahoney, she was alone in the patio area when Summers took his last shot.[10] William and James had left. Even if "the shooter merely perceiv[ed] the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill." (*Smith, supra*, 37 Cal.4th at p. 742; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 119.)

---

[10] Although James did not observe a delay before the final shot was fired, his version is not necessarily inconsistent with Mahoney's. James said the shots had all been fired when he went inside the house. He did not hear any other shots after he went inside the house. James's testimony would have placed him inside the house when Mahoney was outside for the final shot.

William's testimony does not appear inconsistent with Mahoney's version either. He initially testified that after the shots were fired, he ran into the house. According to William, after the final shot, he, along with James and Mahoney, ran outside to see who was shooting. But on cross-examination, William testified that he ran into the house and waited until the last shot was over. He too would have been inside the house when Mahoney was outside for the final shot.

## V. Instruction on the Kill Zone

Summers challenges the version of the kill zone instruction read to his jury. The trial court read the pre-*Canizales* version of CALCRIM No. 600. It stated:

> A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Vandalena Mahoney in Count One, James Harrison in Count Two, Sir in Count Four and/or Jane Doe in Count Five, the People must prove that the defendant not only intended to kill William Harrison but also either intended to kill Vandalena Mahoney in Count One, James Harrison in Count Two, Sir in Count Four and/or Jane Doe in Count Five, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether defendant intended to kill Vandalena Mahoney in Count One, James Harrison in Count Two, Sir in Count Four and/or Jane Doe in Count Five or intended to kill William Harrison by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Vandalena Mahoney in Count One, James Harrison in Count Two, Sir in Count Four and/or Jane Doe in Count Five.

Summers argues that this instruction was incomplete because it omitted three requirements to be proven by the prosecutor: William was the primary target, Summers designed a kill zone with the intent to kill everyone inside, and the secondary targets were within the kill zone.

17

We reject Summers's argument. We should interpret an instruction " 'to support the judgment rather than defeat it if [it is] reasonably susceptible to such an interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) Following this principle, we conclude that the instruction included the three requirements noted by Summers, even if not in the exact language he articulates.[11] It did not contain erroneous language or misstate the law on the kill zone theory.

[11] The terms identified by Summers appear to be some of the terms contained in the most recent iteration of the kill zone instruction. CALCRIM No. 600 currently states:

[A person may intend to kill a primary target and also [a] secondary target[s] within a zone of fatal harm or "kill zone." A "kill zone" is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

In order to convict the defendant of the attempted murder of [*insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory*], the People must prove that the defendant not only intended to kill [insert name of primary target alleged] but also either intended to kill [insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory], or intended to kill everyone within the kill zone.

In determining whether the defendant intended to kill [*insert name or description of victim charged in attempted murder count[s] on concurrent-intent*

18

*theory*], the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) [*insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory*] was located within the kill zone.

In determining whether the defendant intended to create a "kill zone" and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following:

[• The type of weapon used(;/.)]

[• The number of shots fired(;/.)]

[• The distance between the defendant and [*insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory*(;/.)]

[The distance between [*insert name or description of victim charged in attempted murder count[s] on concurrent-intent theo*ry] and the primary target.]

If you have a reasonable doubt whether the defendant intended to kill [*insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory*] or intended to kill [*insert name or description of primary target alleged*] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [*insert name or description of victim charged in*

19

First, the instruction did require finding that William was the primary target, even though it used different terms to distinguish the primary target from the secondary targets. The first two sentences of the instruction informed the jury that William was the primary target, or a "specific victim," and Mahoney, James, Sir, and Armi (referred to as Jane Doe) were the secondary targets, or "everyone in a . . . 'kill zone.' " The instruction also identified William as the primary target in the third sentence by imposing the proof beyond a reasonable doubt standard on the requirement that Summers had the intent to kill him by killing everyone in the kill zone. The jurors would have recognized that the instruction distinguishes William from everyone else because they are presumed to have read it in its entirety with the different portions in relation to one another. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1224–1225, overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Second, Summers argues that the instruction failed to require finding that he designed or created a kill zone with the intent to kill everyone inside. The intent to kill everyone in a particular area is the critical feature of the kill zone theory as required by *Canizales*. (*Canizales*, *supra*, 7 Cal.5th at p. 607, fn. 5.) Without requiring this concurrent intent to kill, the instruction would permit indiscriminate shooting or shooting in a manner that merely placed persons at lethal risk. For example, an instruction is improper if it allows the intent to kill "anyone" inside the kill zone. (*People v. Stone* (2009) 46 Cal.4th 131, 138, fn. 3.)

> *attempted murder count[s] on concurrent-intent theory*.]

20

But here, the requirement of intent to kill everyone inside the kill zone was included in the first and third sentences of the instruction.[12] The latter portion of ensuring the primary target's death is communicated in the second sentence of the instruction, which required an intent to kill the primary target, as well as an intent to kill everyone in the kill zone.

Third, although the instruction does not explicitly require that the secondary targets be in the zone as Summers complains, the first sentence described them as "everyone in the kill zone." The second and third sentences again include "everyone" in or within the kill zone to reiterate the requirement that the secondary victims must be in the kill zone.

We also reject Summers's contention that the prosecutor's closing argument "amplified" or "exacerbated" the errors in the instruction. To support his position, Summers points to the prosecutor's argument that "firing the gun five times at five people in a very small area demonstrated the specific intent to kill five people." Summers asserts that this argument also omitted the requirements of a primary target and intent to create a kill zone to kill everyone inside as a means of killing the primary target.

We agree that the quoted statement did not include the requirements mentioned by Summers. But it referred to the alternative theory of direct intent to kill, not the kill zone theory.

---

[12] Summers claims that the jury was confused by the kill zone instruction, as demonstrated by its question asking for "clarification regarding the definition of attempted murder in regards to 'intent,' (i.e., does firing into a group of people in a 'kill zone' show intent?)" But the jury asked no additional questions after the trial court re-read CALCRIM No. 600, even though invited to do so if it required clarification.

Summers did not reference the entire statement. The prosecutor said, "You can independently think that, well, he's firing a gun at five people, so apparently he's trying to kill five people. You can also conclude that. But either way, he's guilty of five counts of attempted murder . . . ." The prosecutor offered the theory of direct intent to kill as an alternative theory of liability. The statement did not include the kill zone requirements because it did not involve the kill zone theory.

Summers also ignores the prosecutor's statements before his argument about the theory of direct intent to kill. These statements addressed the elements that Summers claims were missing from the kill zone instruction. First, the prosecutor stated that William was the initial target. Second, the prosecutor explained that the kill zone theory involved the intent to kill William, and "to accomplish that goal, he's gotta kill everybody else in this kill zone." These statements complied with the kill zone law as stated in *Canizales*, as well as directly addressed Summers's complaints about the instruction.

We conclude the kill zone instruction read to the jury did not improperly omit the requirements of a primary target, the intent to kill everyone inside the kill zone as a means of killing the primary target, and the secondary targets being in the kill zone. Nor did the instruction eliminate or minimize the prosecutor's burden of proof as to any element of the kill zone theory.

**DISPOSITION**

The petition is denied and the order to show cause is discharged.

**CERTIFIED FOR PUBLICATION**


HANASONO, J.*


We concur:


EDMON, P. J.


EGERTON, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.